IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ERIC ROBY, | ) CASE NO. 1: 18 CV 006 |
| Plaintiffs, | ) |
| v. | ) JUDGE DONALD C. NUGENT |
| THE LINCOLN ELECTRIC COMPANY, | ) MEMORANDUM OPINION |
| | ) AND ORDER |
| Defendant. | ) |

This matter is before the Court on the motion of Defendant Lincoln Electric Company ("Lincoln") to Decertify the Conditionally Certified Class. (ECF #125). The motion is now fully briefed and ready for decision. For the reasons that follow, Defendant's Motion to Decertify the Conditional Class is GRANTED.

## I. PROCEDURAL AND FACTUAL BACKGROUND[1]

The Named Plaintiff, Eric Roby, brought this action on behalf of himself and "all others

---

[1] Except as otherwise cited, the factual summary is based on the parties' briefing and supporting evidentiary materials.

similarly situated," claiming that Defendant, The Lincoln Electric Company ("Lincoln") had a policy and/or practice in place at its Mentor and Euclid Ohio plants, that violated the Fair Labor Standards Act. This practice or policy was to automatically, and allegedly unlawfully, deduct 19.8 minutes from each pieceworker's eight hour shift as an unpaid meal break, resulting in instances of unpaid overtime. The Court conditionally certified the class on December 28, 2018. Following certification, 316 Plaintiffs, opted in from a potential class of 1,255. The parties have since conducted class discovery which encompassed extensive written discovery and the depositions of ten opt-in Plaintiffs.

    The named Plaintiff, Mr. Roby, and the other 315 opt-in Plaintiffs, work (or formerly worked) in either Lincoln's Mentor or Euclid plants. Lincoln Electric manufactures welding products, including welding equipment and so-called consumables such as welding wire and flux used by welders. In the Euclid and Mentor plants there are dozens of departments and 3000 employees. The 316 opt-in Plaintiffs include dozens of different job titles in ten different departments on three different shifts under a dozen different supervisors. All of the Plaintiffs are paid on a piece-rate system. Under the piece rate system employees are not paid strictly by the hour, but rather on the number of goods (such as coils of wire) they produced each shift. The piece rate paid for each unit of production was derived from time studies and includes standard allowances for personal time such as meal breaks, clean up and administrative functions, as well as for other matters such as equipment downtime, or waiting for parts. In addition to the piece rate, Lincoln also paid an overtime premium for hours worked in excess of 40 per week. To ensure proper calculation of overtime, the company kept both production records to determine the amount of product the worker produced and what they earned based on production; and time

records to determine and pay the proper amount of overtime. The company, as verified by Mr. Roby's testimony, encouraged its workers to work overtime.

Lincoln's 20 minute auto-deduct meal break policy was put in place decades ago and is contained in the Company's handbook. The company prohibits off the clock work described as follows:

> All employees must be paid for all hours worked without exception. Consequently, we strictly forbid employees from all off the clock work, whether before their scheduled shifts, afterwards, **or during unpaid meal periods.** Employees are encouraged and expected to report all violations of this core policy to Human Resources or Payroll.
> . . .
> **...You may not work during lunch periods ... Employees are expected to shut all machinery down during lunch periods and you should stop working then or make arrangements for someone to operate the machine on their behalf while they take lunch.**
>
> If there are occasions when employees do any work before or after their scheduled shift, (or during an unpaid meal period), they must be paid. Employees must promptly complete an AC256 form and submit it to their supervisor to ensure payment for all time actually worked. These forms are readily available from your supervisor, who will also be responsible for insuring a form is completed and submitted for all work performed before or after scheduled hours. Employees should notify Payroll or Human Resources immediately if AC256 form are not available or if they are not paid for all hours worked."

(ECF #32-1 at p.76, emphasis supplied) New employees attend orientation and are given access to a copy of the handbook through the company website when they are hired and the handbook is available to all employees online. In addition, the Company distributed a memo in 2013 reminding employees that they were required to take their meals and to report any missed breaks. Supervisors reviewed the memo with their employees in Mentor and posted it on bulletin boards. Mr. Roby recalls that management told the cored wire department employees to take their breaks because it was federal law. There were additional meetings between supervisors and their

employees on this topic in 2017. The Company also contends that there were procedures to report missed time or missed meal breaks. Employees could inform payroll, human resources or their supervisor that they worked through a meal. Some departments used the AC256 form to correct timekeeping issues. While only one opt-in Plaintiff asserted that he did not receive the company handbook, the 199 opt-in Plaintiffs who submitted declarations claim that they were unaware of Defendant's policy for reporting missed meal breaks.

In most cases, Lincoln did not dictate when an employee should take the 20 minute meal break and the meal practices varied widely between the two plants and between departments in the same plant. The Mentor plant has a cental cafeteria with tables, vending machines and microwaves and most employees bring their lunch. The cafeteria is less than a three minute walk from the most distant line and a two minute walk or less from most work areas. The Euclid plant is much larger. It has a full service cafeteria with chefs who prepare breakfast and lunch for purchase. There are also vending machines. Some employees are closer to the cafeteria than others who may be as much as a 25 minute walk away from the cafeteria. The timing and distance to the cafeteria is entirely different depending on the employee and the location of his or her work space. There are various break areas closer to the production floor in Euclid spread around the plant in alcoves which are equipped with tables and chairs and vending machines that are used by employees to eat in during their shift and meal breaks. These alcoves are considerably closer to the production floor and take only a short time to reach.

Meal times also varied depending on department. Some departments set a break time or encouraged workers to take a break midway through their shift while others did not, leaving employees to take a meal break whenever they wanted. Many workers chose to take their breaks

during a time when their machine was down or someone was available to watch their machine so that their production was not affected. Employees did not need supervisory approval to take their meal break and supervisors were not tasked with overseeing the meal breaks. The evidence provided by the parties indicates that some of the opt-in Plaintiffs took lunch on some days and not on others, some ate something at their machines or in an alcove, and most of the opt in Plaintiffs who responded said that 20 minutes was too short of a time to eat a full lunch in the cafeteria. Many of the deposed Plaintiffs, like most employees paid on a piece rate, typically worked through their breaks because the more they produced, the more they were paid.

## II. DISCUSSION

### A. Standard of Review

The Fair Labor Standards Act ("FLSA") seeks to provide "specific minimum protections to individual workers" and to ensure that each covered worker receives a "fair day's pay for a fair day's work. *Barrentine v. Arkansas-Best Freight Sys. Inc.*, 450 U.S. 728, 739 (1981). The Act allows one or more employees to bring an enforcement action on their own behalf and as a representative for other similarly situated employees. 29 U.S.C. §216(b). Many courts within and without the Sixth Circuit have adopted a two-stage process for determining whether an FLSA action should proceed as a collective action. *See, e.g., Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006). In this process, the Court determines based on the complaint and some modest factual allegations, whether there is a colorable basis for their claim that the putative class is "similarly situated" with regard to plausibly alleged claims. If so, the Court generally permits opt-in notification and additional discovery. This standard is "fairly lenient" and typically results is conditional certification of the class for purposes of notification. At this

stage, the existence of significant individualized issues does not preclude conditional certification. *See, White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 367 (E.D. Tenn. 2006). However, following the completion of the opt-in period and the conclusion of full discovery, the court applies a stricter standard for proving that the parties should be treated as a class.

During the second stage of review, the court must "examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer*, 454 F.3d at 547. At this point, the Court must consider all the evidence, in conjunction with the demographic data of the putative opt-in plaintiffs to determine whether the assembled class may continue as a collective action or whether the putative class should be decertified, leaving plaintiffs free to pursue their claims individually. *See Creely v. HCR ManorCare Inc.*, 920 F.Supp.2d 846, 851 (N.D. Ohio 2013). "The question is simply whether the differences among the Plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Monroe v. FTS USA, LLC*, 763 F.Supp.2d 979, 994 (W.D. Tenn. 2011). Plaintiffs must generally produce "more than just allegations and affidavits" demonstrating similarity in order to achieve final certification. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)

The Sixth Circuit has approved the following three factors to be weighed by the district court during the second stage analysis: (1) the disparate factual and employment settings of the individual opt-in plaintiffs; (2) the different defenses to which the plaintiffs may be subject on an individual basis; and (3) the degree of fairness and procedural impact of certifying the action as a collective action. *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F.App'x 669, 671-72 (6th Cir. 2012); *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009), (abrogated on other grounds by *Campbell-Ewald Co., v. Gomez*, 577 U.S. 153 (2016)

B. <u>Analysis</u>

**1. Disparate factual and employment settings**

Plaintiffs assert that there are three common ways in which Lincoln violated the FSLA and that any factual and employment setting variations among the Plaintiffs do not vitiate these common theories of liability. *See O'Brien*, 575 F.3d at 585. Specifically, Plaintiffs argue (1) that the 20 minute meal break was an insufficient amount of time to eat a regular meal and thus is not a bona fide meal break under the FSLA; (2) that Lincoln had a policy of non-enforcement of its meal break policies; and (3) Lincoln failed to communicate its missed meal break policies to piece rate employees.

However, Plaintiffs are not deemed similarly situated at the second stage merely because they recite a common theory of liability. *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919, at *3 (S.D. Ohio Nov. 2, 2015). To proceed beyond the second stage "[a]n allegation of an overarching policy is generally insufficient; plaintiffs must produce substantial evidence of a single decision, policy or plan." *Reed v. Cnty. of Orange*, 266 F.R.D. 446, 458 (C.D. Cal. 2010); *see White v. Baptist Memorial Health Care Corp.*, 2011 WL 1883959 at *14 (W.D. Tenn May 17, 2011)(setting forth substantial evidence as standard for showing a common policy at the second stage), *aff'd*, 699 F.3d 869 (6th Cir. 2012). Where, as here, a defendant has demonstrated a formal policy to comply with the law and compensate employees for all time worked, plaintiffs may satisfy their burden by producing substantial evidence of a de facto policy of circumventing the law. *White*, 2011 WL 1883959 at *9 (*citing Pacheco v. Boar's Head Provisions* Co., 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009)).

### A. Bona fide meal break

A bona-fide meal break is defined as a break during which the employee is "completely relieved of duty for the purposes of eating regular meals." 29 C.F.R. § 785.19. The regulations state that "[o]rdinarily 30 minutes or more is long enough for a bona fide meal period" but "[a] shorter period may be long enough under special conditions." *Id*. In a case challenging the validity of an unpaid break, the employee bears the burden of showing that the break is not a bona fide meal break. *Myracle v. General Electric Co.*, 333 F.3d 55, 1994 WL 456769, at *4 (6th Cir. 1994). To determine whether a meal break is compensable, the Sixth Circuit looks at whether the break allows an employee to pursue his or her mealtime adequately and comfortably, whether the employee is engaged in the performance of substantial duties during the break, and whether the time is spent predominantly for the employer or the employee's benefit. *Hill v. United States*, 751 F.2d 810, 814 (6th Cir. 1985).

The evidence submitted by the parties on this issue highlights the disparate factual and employment settings of the individual opt-in Plaintiffs.[2] The form affidavits submitted by 199 of the 316 opt in Plaintiffs all assert that they did not take a lunch break despite the automatic deduction; that there was not enough time to take a lunch break based on the nature of the work they were doing and the layout of the plant; or if they ate lunch they ate while they worked. While these statements are somewhat contradictory, the deposition testimony shows that meal habits vary widely depending on an employee's plant, their location within that plant, and their department's meal break rules. Some departments had set meal times and their machines were shut down, others

---

[2] Indeed, the Court noted the existence of material questions of fact when denying the parties cross motions for summary judgment on this point.

had suggested times and some left the timing of the break up to the employee. Some departments ordered in food for their breaks. Some machines ran all the time but did not need constant monitoring. The only "common" thread here is that this question is individualized for each conditional class member and will be subject to different proofs and defenses on an individualized basis.

**B. Policy of Non-Enforcement**

There is no dispute that the meal break policy is contained in the employee handbook which is available to all employees and was discussed in each employee's orientation. The handbook is clear that the 20 minute meal break is mandatory. As noted in some of the deposition testimony of both Plaintiffs, including Mr. Roby, and Lincoln supervisors, the mandatory nature of the meal break was explained to employees and highlighted by some supervisors in certain departments in 2013 and 2017 and efforts were made for some period of time to ensure that employees took their lunch break. Whether and how much the meal break policy was enforced seems to again depend on an employee's plant, department and supervisor. While some of the Plaintiffs say that they never took a meal break and others occasionally did not take a meal break, there may be many individual reasons for a worker's decision not to take the meal break, other than the Defendant's alleged policy of non-enforcement. Most importantly, because the Plaintiffs here are piece rate workers, they may choose to work through breaks in order to maximize their pay. The evidence submitted by Defendant shows that it was Lincoln's policy to pay its employees for all hours worked and to require the taking of the 20 minute meal break. As the Court in *Cornell,* 2015 WL 6662929 at *3-*4, explained in decertifying a conditional class at the second stage:

> The question in a FSLA collective action is not whether Defendants effectively promulgated their workplace policies to their employees. Rather,

at stage two, the Court must ask whether Plaintiffs have carried their burden of showing substantial evidence of Defendants' offending policies, whether formal and written or merely de facto. Plaintiffs have failed to produce substantial evidence that they were compelled to perform off-the clock work pursuant to a common policy, plan, or scheme. Rather, the evidence shows that Defendants' policy was to pay its employees for all hours worked. Although Plaintiffs offer substantial evidence that some workers did perform at least occasional off-the-clock work, the evidence indicates that the decisions of individual workers and supervisors, not a company-wide policy, were the causal factor.

Similarly, in this case, there is no evidence that Plaintiffs were compelled to perform off the clock work by any company policy, however some employees may have chosen to ignore company policy and work through the mandatory meal break. Again, whether an employee chose to ignore company policy and if so, why, is an individualized question for each class member. Plaintiffs have not produced substantial evidence that any Lincoln policy, formal, written or de facto was the causal factor for any plaintiff's decision to skip a meal break.

**C. Failure to Communicate Policies**

Plaintiffs allege that Lincoln failed to communicate its missed meal break policies to piece rate employees, resulting in a common belief that the 19.8 minute deduction was just the way it is and that employees could not get paid for working during this time. As noted above, all employees had access to the employee handbook which clearly stated the Company's meal break policy and the methods to obtain payment for any missed meal breaks. Further, some plaintiffs, including Mr. Roby, recall meetings with their supervisors where the meal break policy was explained and employees were told to take their meal break. Thus, questions regarding an employees' understanding of the handbook and company policies are individualized and would require testimony from all 316 plaintiffs.

Review of Plaintiffs' alleged common theories of liability here does not demonstrate that the

-10-

plaintiffs are similarly situated. The significant disparity between plaintiffs' factual and employment settings as to their meal breaks here results in highly individualized questions of fact. Thus, the first *O'Brien* factor weighs in favor of decertification.

## 2. Individualized Defenses

The second relevant factor is the extent to which defenses appear to be individual to each Plaintiff. The presence of many individualized defenses makes a representative class unmanageable. *Cornell*, 2015 WL 6662919 at *4. "Where plaintiffs' factual and employment settings are similar, these defenses do not necessarily render collective treatment unmanageable." *Frye v. Baptist Mem. Hosp., Inc.*, No. CIV 07-2708, 2010 WL 3862591, at *9 (W.D. Tenn. Sept. 27, 2012). However, where plaintiffs have disparate factual and employment settings, as they do here, defenses will likely be individualized, rendering collective treatment inappropriate.

Defendant argues that its defenses here are as disparate as each Plaintiff's experience. Given the lack of uniformity with respect to whether and/or how often workers took their meal breaks in this case, and the fact that their actions were often dictated by the practices of their department and job duties, their plant and their supervisors, and their own self interest, the Court or jury will need to resolve a number of different factual questions for each Plaintiff (offset by the corresponding defenses) in order to determine if there was an FSLA violation for each and every Plaintiff. Courts have decertified auto-deduct classes that exhibit these types of factual distinctions among a class of plaintiffs. *See Camesi v. Univ. of Pittsburgh Med. Ctr,.* 2011 WL 6372873 at *7-8 (W.D. Penn. 2011)(Court decertified a class of employees who were subject to an auto-deduct policy finding that there were numerous differences among the opt-in plaintiffs, including different job titles, and responsibilities, hundreds of different supervisors and that the differences in job duties "we[re]

highly relevant to their claims that they worked during meal breaks without compensation because their job duties dictated whether and why they experienced missed or interrupted meal breaks."); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852 at *5-6 (W.D. Penn. 2011) (Court decertified a class of 806 plaintiffs that held many different job titles, had varying duties and worked for hundreds of different supervisors. Noting that the auto-deduct policy "differed based on a number of factors, not the least of which was based on the nature of the jobs performed by Plaintiffs, the departments in which Plaintiffs worked, the supervisors' procedures, and the shifts the Plaintiffs worked."); *Creely*, 920 F.Supp.2d 846, 857(Court decertified an auto-deduct class finding that the factual variations among individual opt-in plaintiffs, facilities and the hundreds of managers who implemented Defendant's policy show that Plaintiffs are not similarly situated with respect to Defendant's implementation of its auto-deduct policy.")

Based on the evidence submitted to date, the Court finds that individualized defenses would overwhelm any trial of this case as a collective action. Accordingly, this factor weighs in favor of decertification.

### 3. The Degree of Fairness and Procedural Impact

The final consideration is whether continuing to proceed collectively is fair, procedurally manageable, and in accord with the "broadly remedial and humanitarian" purposes of the FSLA. *Frye*, 2010 WL 3862591, at *9. Courts balance the cost alleviation enjoyed by individual plaintiffs and any increase in judicial efficiency against the potential harm to defendants and any potential judicial inefficiency. *Cornell*, 2015 WL 6662919 at *4. Although the FSLA "must not be interpreted or applied in a narrow, grudging manner," *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 144 (6th Cir. 1977), "the remedial nature of the FSLA, standing alone, does not justify allowing a case to

proceed collectively." *Cornell,* 2015 WL 6662919 at *5 (citation omitted.)

Because the Plaintiffs have not shown that they are similarly situated and their right to compensation under the FSLA hinges on their individual experiences, no judicial economy would be gained by allowing this collective action to proceed. Instead, continuing as a collective action would result in unfairness to Defendant and inefficiency for the Court. Accordingly, the third factor weighs in favor of decertification.

Plaintiffs request that the Court divide the collective into subclasses if it determines that the collective class is not similarly situated. While recognizing that the Court has wide discretion to manage collective actions, in this case there is no meaningful way to group Plaintiffs because their claims, and the proof thereof, are individualized. Dividing the Plaintiffs by plant or department would be ineffective because the Plaintiffs' meal break habits varied by department, by location within the plants, and by supervisor. In any event, Plaintiffs do not offer any suggestion as to what sub-classes would be feasible or just.

### III. CONCLUSION

For the reasons stated above, the Court finds that the Plaintiffs in this matter have failed to present substantial evidence that they are similarly situated with respect to Defendant's auto-deduct policy. The record shows a variety of factual and employment settings among the individual Plaintiffs and the actions of multiple supervisors and managers. As a result, the defenses are individualized, and it would be unfair and impractical, to both sides, to have representative testimony presented for the proposed class when any one Plaintiff's situation is potentially markedly different from another's. Consequently, decertification of this action is appropriate. Defendant's Motion to Decertify the Conditionally Certified Collective Action (ECF #125) is granted. The claims

of all of the opt-in Plaintiffs are dismissed without prejudice.

IT IS SO ORDERED.

_/s/ Donald C. Nugent_
DONALD C. NUGENT
United States District Judge

DATED: _February 24, 2021_